**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In re Read-Rite Corporation,<br><br>          Debtor.<br><br>HITACHI GLOBAL STORAGE TECHNOLOGIES NETHERLANDS B.V. AND HITACHI, LTD.,<br><br>          Appellants,<br><br>   v.<br><br>READ-RITE CORPORATION, a Delaware corporation,<br><br>          Appellee. | No. CV-06-04173 SC<br><br>ORDER AFFIRMING THE BANKRUPTCY COURT <u>DECISION</u> |

**I.   INTRODUCTION**

Hitachi Global Storage Technologies Netherlands B.V. and Hitachi, Ltd. (collectively, "Hitachi") appeal the Bankruptcy Court's June 19, 2006 ruling in the case of debtor Read-Rite Corporation ("Read-Rite").  Appellees Western Digital Corporation and Western Digital (Fremont), Inc. (collectively "Western Digital") oppose Hitachi's motion.

**II.   BACKGROUND**

In 1997, Read-Rite and International Business Machines Corporation ("IBM") entered into a license agreement for a set of patents and patent applications.  <u>See</u> Docket No. 7, Appendix to

**United States District Court**
For the Northern District of California

1   Appellants' Brief ("AA"), Ex. A.  Section 2.10 of the agreement

2   provides that in the event one party transfers a product line to

3   another company, the new company has the right to request a

4   license agreement and the party to the original license agreement

5   will enter into the new agreement forthwith.  See id.  On December

6   31, 2002, IBM transferred its hard disk drive product line to

7   Hitachi.  The parties have stipulated that the deal between IBM

8   and Hitachi satisfied the conditions of Section 2.10, such that

9   Read-Rite and Hitachi needed to execute a licensing agreement.

10  See id., Ex. C.  After selling its disk drive business to Hitachi,

11  IBM made three requests to Read-Rite for Read-Rite's approval of a

12  license for Hitachi.  Upon receiving IBM's February 28, 2003

13  request and the attached draft agreement, Read-Rite's General

14  Counsel Colin Campbell responded with a letter suggesting changes

15  to the draft.  By letter dated April 28, 2003, IBM rejected Mr.

16  Campbell's proposed changes and requested that Read-Rite sign the

17  agreement as is.  On May 12, 2003, Mr. Campbell called IBM's

18  senior counsel Robert Tassinari, and left a message stating that

19  he was comfortable with the proposed license agreement, except

20  that the license should be executed with Hitachi Ltd. rather than

21  Hitachi Global Storage Technologies Netherlands B.V.  After some

22  internal discussions at IBM and Hitachi, Mr. Tassinari sent a

23  modified draft to Read-Rite on June 16, 2003 and emailed a copy of

24  the documents on June 17, 2003.  Read-Rite filed its chapter 7

25  bankruptcy petition later that same day.  Though Mr. Campbell

26  asked Read-Rite CFO Andrew Holcomb to sign the agreement, Mr.

27  Holcomb refused, stating that it was best left for the bankruptcy

28

**United States District Court**
For the Northern District of California

1    Trustee.  See id., Ex. E, H 194-280 (trial transcript providing

2    the time line of events).  On June 18, Mr. Campbell informed IBM

3    that because Read-Rite had filed for bankruptcy, no one could or

4    should sign the license agreement at that time.  After the filing

5    of the bankruptcy petition, IBM repeatedly asked the Trustee to

6    sign the agreement, but the Trustee refused.

7         On July 25, 2003, following an auction, the Bankruptcy Court

8    entered an order authorizing the Trustee to sell substantially all

9    of the estate's assets to Western Digital for $87 million.  See

10   Appendix to Appellees' Brief ("AB"), Ex. 6.  The sale was to be

11   "free and clear" of all liens and claims, except for rights of a

12   non-debtor in Read-Rite's intellectual property under Section

13   365(n) of the Bankruptcy Code.  Id.  Hitachi participated in the

14   auction for Read-Rite's assets and was aware of the free and clear

15   provisions of the sale.  See id., Ex. 3.  On November 14, 2003,

16   the Trustee filed a motion seeking to reject certain contracts,

17   including the IBM license agreement.  The Bankruptcy Court

18   approved the motion on January 12, 2004 and set a bar date of

19   February 1, 2004 for parties to assert rights under Section

20   365(n).  See id., Ex. CC.  Both the Trustee's motion and the

21   Bankruptcy Court's rejection order were noticed to approximately

22   seventeen separate Hitachi addresses, as well as two offices of

23   Hitachi's counsel.  See id., Ex. 15.

24        It was not until February 22, 2005, over a year after the bar

25   date, that IBM submitted a declaration electing to retain

26   intellectual property rights under its license with Read-Rite.

27   See AA, Ex. LL.  Western Digital filed its objection on June 6,

28

**United States District Court**
For the Northern District of California

1  2005, and on October 21, 2005 Hitachi filed a response to Western

2  Digital's objection.  See AA, Ex. MM; Ex. NN.  The Bankruptcy

3  Court held a trial to determine the issues presented by Hitachi

4  and issued its findings on June 19, 2006.  See AA, Ex. D.  The

5  Bankruptcy Court ruled against Hitachi.  See id.  This appeal

6  followed.

7

8  **III.  LEGAL STANDARD**

9      The District Court reviews the Bankruptcy Court's findings of

10  fact for clear error and its conclusions of law de novo.  See In

11  re Lazar, 83 F.3d 306, 308 (9th Cir. 1996); see also Fed. R.

12  Bankr. P. 8013 ("Findings of fact . . . shall not be set aside

13  unless clearly erroneous, and due regard shall be given to the

14  opportunity of the bankruptcy court to judge the credibility of

15  the witnesses.").  "A finding of fact is clearly erroneous when

16  after reviewing the evidence we are left with the definite and

17  firm conviction that a mistake has been committed."  In re Arnold

18  and Baker Farms, 177 B.R. 648, 653 (9th Cir. BAP 1994).

19  Furthermore, "[t]he bankruptcy court's determination of the

20  existence of excusable neglect is reviewed for an abuse of

21  discretion."  In re Cahn, 188 B.R. 627, 629 (9th Cir. BAP 1995).

22

23  **IV.  DISCUSSION**

24      **1.  Did Hitachi and Read-Rite enter into a binding license**

25          **agreement?**

26      In its Order ("Bankruptcy Order"), the Bankruptcy Court found

27  that Hitachi and Read-Rite had not entered into a binding license

28                                  4

**United States District Court**
For the Northern District of California

1    agreement prior to Read-Rite's June 17, 2003 bankruptcy petition.

2    See AA, Ex. D, 134.   The Bankruptcy Court provided four reasons

3    for its ruling that the license agreement was not effective

4    because it had never been signed.

5         The first question before this Court is whether the

6    Bankruptcy Court erred in ruling that there was no binding license

7    agreement between Hitachi and Read-Rite pursuant to Section 2.10

8    of the contract between IBM and Read-Rite.   See AA, Ex. A.   The

9    parties agree that New York law applies to this case because the

10   underlying contracts are based on New York law.   The Bankruptcy

11   Court applied New York law in its findings and this Court agrees

12   with the assessment of the Bankruptcy Court and the parties.

13        "Under New York law, if parties do not intend to be bound by

14   an agreement until it is in writing and signed, then there is no

15   contract until that event occurs."   R.G. Group, Inc. v. Horn &

16   Hardart Co., 751 F.3d 69, 74 (2d Cir. 1984).   As such, "if either

17   party communicates an intent not to be bound until he achieves a

18   fully executed document, no amount of negotiation or oral

19   agreement to specific terms will result in the formation of a

20   binding contract."   Winston v. Mediafare Entm't Corp., 777 F.2d

21   78, 80 (2d Cir. 1986).   In analyzing the evidence presented, the

22   Bankruptcy Court found that the parties did not intend to be bound

23   until the agreement was signed.   Bankruptcy Order at 135.   In

24   making its determination, the Bankruptcy Court examined the four

25   factors described in Winston and found that the evidence showed no

26   intent to be bound absent a signed agreement.

27        The District Court will review the Bankruptcy Court's factual

28                                  5

**United States District Court**
For the Northern District of California

1  findings on intent under the clearly erroneous standard.  <u>See</u>

2  <u>Ciarmella v. Reader's Digest Ass'n, Inc.</u>, 131 F.3d 320, 322 (2d

3  Cir. 1997) ("The intention of the parties on this issue is a

4  question of fact, to be determined by examination of the totality

5  of the circumstances."); Fed. R. Bankr. P. 8013 ("Findings of fact

6  . . . shall not be set aside unless clearly erroneous").

7  According to <u>Winston</u>, the Court considers four factors:

8        (1) whether there has been an express reservation of the
         right not to be bound in the absence of a writing;
9        (2) whether there has been partial performance of the
         contract;
10       (3) whether all of the terms of the alleged contract have
         been agreed upon; and
11       (4) whether the agreement at issue is the type of contract
         that is usually committed to writing.

12 777 F.2d at 80.  The Bankruptcy Court provided explicit findings

13 on each of the four factors.  First, Section 8.10 explicitly

14 stated, "This Agreement shall not be binding upon the parties

15 until it has been signed hereinbelow by or on behalf of each

16 party."  AA, Ex. J; Bankruptcy Order at 134.  Second, the

17 Bankruptcy Court found no evidence of partial performance of the

18 contract.  Bankruptcy Order at 135.  Third, the court found that

19 Read-Rite's bankruptcy "might well have raised a whole new set of

20 issues that needed to be incorporated into subsequent drafts of

21 the agreement."  <u>Id.</u>  Fourth, the court found that license

22 agreements, like the one at issue, are ordinarily written and

23 executed for a variety of reasons, including the complexity and

24 high dollar value of the transaction and because they are

25 agreements between competitors and customers in the field of

26 information technology.  <u>Id.</u>

27

28

6

**United States District Court**
For the Northern District of California

1    Evidence regarding the first factor clearly indicates an

2  express reservation not to be bound in the absence of a writing.

3  First, the IBM—Read-Rite agreement as well as the Read-Rite—

4  Hitachi draft agreements all contained Section 8.10, a provision

5  requiring a signature to bind the parties.  Second, to execute the

6  document, Read-Rite's General Counsel Colin Campbell sought to

7  have the agreement signed by a Read-Rite executive, who declined

8  and said to leave the decision to the bankruptcy Trustee.  See AA,

9  Ex. E, 279-80.  Third, IBM made several attempts on behalf of

10 Hitachi to have the agreement executed by both Read-Rite and

11 Hitachi.  See Appellants' Brief, 7.  Finally, drafts of the

12 agreement sent between IBM and Read-Rite contained a header

13 stating "DRAFT FOR DISCUSSION PURPOSES ONLY" at the top of each

14 page.  See AA, Ex. J.  There is substantial evidence in the record

15 that the parties expressly reserved the right not to be bound

16 until the agreement was fully executed.

17    Evidence regarding the second factor also demonstrates a

18 failure to form a contract.  As the Bankruptcy Court correctly

19 noted, there was no partial performance of the contract.  Read-

20 Rite did not grant Hitachi a license and never acted as though it

21 had.  "Aside from unilateral contracts, partial performance is an

22 unmistakable signal that one party believes there is a contract;

23 and the party who accepts performance signals, by that act, that

24 it also understands a contract to be in effect."  R.G. Group, 751

25 F.2d at 75-76.  In this case, there was no partial performance.

26 Thus, there is no evidence that the parties believed there was a

27 contract absent signatures.

28

1    Evidence regarding the third factor indicates that all the

2    terms of the contract had not been settled.  As the Bankruptcy

3    Court acknowledged, Read-Rite's bankruptcy filing "might well have

4    raised a whole new set of issues."  Bankruptcy Order at 135.

5    Indeed, while Read-Rite was originally willing to compromise its

6    position on contract language in order to court Hitachi Japan as a

7    customer, as Read-Rite's finances deteriorated, its priorities

8    changed.  See AA, Ex. E, 280, 292.  This Court agrees with the

9    Bankruptcy Court's analysis and finds that the evidence

10   demonstrates that all the terms of the contract had not been

11   settled prior to Read-Rite's bankruptcy petition.

12       Evidence regarding the fourth factor also indicates a failure

13   to form a contract.  Licensing agreements of this type are

14   customarily written and executed.  "Where, as here, the parties

15   are adversaries and the purpose of the agreement is to forestall

16   litigation, prudence strongly suggests that their agreement be

17   written in order to make it readily enforceable, and to avoid

18   still further litigation."  Winston, 777 F.2d at 83.  The

19   licensing agreement contains reciprocal covenants not to sue in

20   Sections 2.4 and 2.5 and thus fits the criteria described in

21   Winston and by the Bankruptcy Court.  Furthermore, the Court notes

22   that the statute of frauds in New York, N.Y. Gen. Oblig. Law § 5-

23   701(a)(1), requires a signed writing for any agreement that cannot

24   be performed within one year.  The contract at issue in this case

25   also meets that definition.  Because agreements of this type are

26   customarily written and executed and this agreement was never

27   executed, a contract was never formed.

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Having analyzed the evidence in light of the four <u>Winston</u>

2  factors, the District Court agrees with the Bankruptcy Court and

3  finds that Hitachi and Read-Rite never entered into a binding

4  licensing agreement.

5    **2.   <u>Did Hitachi comply with 11 U.S.C. § 365(n)?</u>**

6    The Bankruptcy Court ruled that even if the agreement between

7  Hitachi and Read-Rite had become binding on the parties, Hitachi

8  failed to exercise its rights under 11 U.S.C. § 365(n) in a timely

9  fashion.  <u>See</u> Bankruptcy Order at 135.  The Bankruptcy Court found

10  that even though Hitachi was "fully apprised of its rights and of

11  the Trustee's motions affecting its rights," Hitachi failed to

12  take appropriate action prior to the bar date for asserting rights

13  under § 365(n).  <u>Id.</u> at 135-36.  Indeed, Hitachi should not have

14  been surprised to find that the Trustee did not list the

15  unexecuted license agreement on the list of contracts accepted or

16  rejected because Read-Rite, the Trustee, and Western Digital

17  consistently asserted that there was no contract.  Having reviewed

18  the record, the Court agrees with the Bankruptcy Court:  Hitachi

19  had actual notice of the proceedings, yet failed to act to protect

20  its asserted rights.  <u>See</u> AA, Ex. C (stipulation stating that all

21  pleadings were served on Hitachi or its subsidiaries).  Moreover,

22  Hitachi failed to present evidence of excusable neglect sufficient

23  to overcome the Bankruptcy Court's ruling.  There is no indication

24  as to why Hitachi sat on its rights for so long before deciding to

25  act.

26    **3.   <u>Hitachi's remaining arguments also fail.</u>**

27    In its brief, Hitachi makes several other arguments as to why

28

**United States District Court**
For the Northern District of California

1  the Court should rule that the license agreement is effective

2  notwithstanding the failure of the parties to execute a written

3  agreement.  First, Hitachi argues that it has an implied license

4  under the doctrine of legal estoppel.  To establish an implied

5  license, Hitachi must show that "a patentee has licensed or

6  assigned a right, received consideration, and then sought to

7  derogate from the right granted."  <u>Wang Labs., Inc. v. Mitsubishi</u>

8  <u>Elec. Am., Inc.</u>, 103 F.3d 1571, 1581 (Fed. Cir. 1997).  Hitachi's

9  argument fails because neither Read-Rite nor Western Digital

10  granted Hitachi a license to the patents and neither received any

11  consideration for doing so.

12      Similarly, Hitachi's reliance on <u>Syndia Corp. v. Lemelson</u>

13  <u>Medical</u>, 165 F. Supp. 2d 728 (D. Ill. 2001) and <u>Institut Pasteur</u>

14  <u>v. Cambridge Biotech Corp.</u>, 186 F.3d 1356 (Fed. Cir. 1999) is

15  unavailing.  In <u>Syndia</u>, the parties had previously executed both a

16  management agreement and a letter agreement, through which the

17  court concluded that a legally binding exclusive license had

18  already been formed.  <u>See</u> 165 F. Supp. 2d at 742-43.  In <u>Institut</u>

19  <u>Pasteur</u>, the parties had already entered into a cross-license

20  agreement which required one party to use its best efforts to

21  recover the rights to the patents.  <u>See</u> 186 F.3d at 1375.  The

22  Court finds both cases distinguishable because Read-Rite and

23  Hitachi had not entered into an agreement prior to the bankruptcy

24  filing date and Western Digital and Hitachi never reached an

25  agreement after Western Digital purchased Read-Rite's assets.  The

26  Court declines to enforce an unsigned agreement which expressly

27  conditioned effectiveness upon valid signatures from both parties.

28

10

United States District Court
For the Northern District of California

1    In addition, Hitachi's argument that Section 2.10 is analogous to

2    an option agreement fails.  The various drafts of the agreement

3    stated that they were "for discussion purposes only," indicating

4    that an option contract was not in effect.  Furthermore, Read-Rite

5    had received no consideration from Hitachi to enter into an option

6    contract.

7         Having carefully analyzed this potential transaction, the

8    District Court agrees with the findings of the Bankruptcy Court.

9    No valid license agreement exists between Read-Rite and Hitachi.

10

11   **V.    CONCLUSION**

12        For the reasons discussed herein, the Court AFFIRMS the

13   decision of the Bankruptcy Court.

14

15        IT IS SO ORDERED.

16

17        Dated: August 13, 2007          _____
                                           UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28                                         11